1                             UNREDACTED

2            IN THE UNITED STATES DISTRICT COURT

           FOR THE WESTERN DISTRICT OF TENNESSEE

3                  EASTERN DIVISION

4     ------------------------------------------------

5

   IVA JOY and WILLIAM JOY          )

6                        )

   VS                     )NO.1:20-CV-01132

7                        )JACKSON, TENNESSEE

   AMGUARD INSURANCE COMPANY     )

8

9   VS

10  ANTHONY LANCASTER INSURANCE

   AGENCY, INC., and ANTHONY

11  LANCASTER,

12    ------------------------------------------------

13

14           EXCERPTED TRIAL PROCEEDINGS

15

16              JUNE 28,2022

17

18

19       BEFORE THE HONORABLE S. THOMAS ANDERSON,

20         UNITED STATES CHIEF JUDGE

21

22

23          KRISTI HEASLEY, RPR

           OFFICIAL COURT REPORTER

24       U.S. COURTHOUSE, SUITE 450

        111 SOUTH HIGHLAND AVENUE

25       JACKSON, TENNESSEE 38301

             UNREDACTED TRANSCRIPT

1                          APPEARANCES

2

3

4    FOR THE PLAINTIFFS:

5    DRAYTON D. BERKLEY, ESQ.
     ATTORNEY AT LAW
6    1255 Lynnfield Road, Suite 266
     Memphis, TN 38119
7

8

9

10   FOR AMGUARD INSURANCE COMPANY:

11   BRIAN F. WALTHART, ESQ.
     MCANGUS GOUDELOCK & COURIE, LLC
12   P.O. Box 198349
     Suite 1400
13   Nashville, TN  37219

14

15   FOR ANTHONY LANCASTER INSURANCE AGENCY:

16   DAVID CHANGAS, ESQ.
     LEWIS THOMAS KING KRIEG & WALDROP
17   424 Church Street, Suite 250
     Nashville, TN 37201
18

19

20

21

22

23

24

25

                         UNREDACTED TRANSCRIPT

3

1                         EXAMINATION INDEX

2

3    DAWN AIGELDINGER

4
         DIRECT BY MR. BERKLEY                        6
5        CROSS BY MR. WALTHART                       16
         CROSS BY MR. CHANGAS                        33
6        FURTHER DIRECT BY MR. BERKLEY               48
         FURTHER CROSS BY MR. WALTHART               50
7

8

9    DAWN AIGELDINGER

10
         DIRECT BY MR. WALTHART                      52
11       CROSS BY MR. CHANGAS                        55
         CROSS  BY MR. BERKLEY                       64
12

13

14

15

16

17

18

19

20

21

22

23

24

25

UNREDACTED TRANSCRIPT

4

1                              EXHIBITS

2

3       13    Report                                      11

4       14    Supplement                                  32

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              THE COURT:  Ma'am, come around behind

2    counsel table and come to the witness box and stop there

3    and Mr. Bryson will administer the oath.

4                    ***************

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              DAWN AIGELDINGER THEREUPON CALLED AS A WITNESS

2  ON BEHALF OF THE PLAINTIFF, AND HAVING BEEN FIRST DULY

3  SWORN, WAS EXAMINED AND TESTIFIED AS FOLLOWS:

4                      DIRECT EXAMINATION

5              THE WITNESS:  Yes.

6              THE CLERK:  Thank you.

7              THE COURT:  All right.  Have a seat and

8  make yourself comfortable.  We'll ask you to remove your

9  mask.  If you will, scoot up pretty close to the

10  microphone and speak directly into the microphone.

11             THE WITNESS:  Okay.

12  BY MR. BERKLEY:

13  Q.   Ma'am, will you introduce yourself to the jury?

14  A.   My name is Dawn Aigeldinger, and I'm the Assistant

15  Vice President of Personal Lines at Guard Insurance.

16             THE COURT REPORTER:  Can you spell that?

17  BY MR. BERKLEY:

18  Q.   And how long --

19             THE COURT:  Hold on.  Spell your name for

20  us, please.

21             THE WITNESS:  It's A-I-G-E-L-D-I-N-G-E-R.

22             THE COURT:  What is your first name?

23             THE WITNESS:  Dawn, D-A-W-N.

24             THE COURT:  Okay.  Thank you.

25             Go ahead, Mr. Berkley.

1    BY MR. BERKLEY:

2    Q.   Now did you -- strike that question.

3         How long have you been in that position with

4    AmGuard?

5    A.   In this position, three years.

6              THE COURT:  Tell me again what your

7    position is.

8              THE WITNESS:  Assistant Vice President of

9    Personal Lines.

10   BY MR. BERKLEY:

11   Q.   Describe for the jury what you mean by personal

12   lines.

13   A.   Personal lines is a line of business at our

14   company.  We write both commercial lines of business and

15   personal lines of business.  And underneath personal

16   lines would be homeowners and umbrella.

17   Q.   How long have you been in the insurance industry

18   generally?

19   A.   I've been in the insurance industry since 2000.  I

20   started with Guard in 2000.

21   Q.   And progressed.  What was your first position with

22   AmGuard?

23   A.   My first position with AmGuard was a small business

24   representative on a commercial line side in our workers'

25   compensation division.

1  Q.    Did you do any underwriting work at that time?

2  A.    Yes, I did.

3  Q.    Now Mr. Lancaster described a rater system.

4        What is your understanding of the rater system?

5  A.    Rater system?

6  Q.    R-A-T-E-R system.

7  A.    We have a proprietary system that we call Guard

8  Easy Rate, if that's what he's referring to.

9  Q.    What kind of information does the Guard Easy Rate

10  compile or utilize?

11  A.    It's a proprietary software, so all of the rating

12  is done by Guard.

13              MR. WALTHART:  Your Honor, I don't know if

14  it's appropriate.  I'm going to object.  I think we're

15  talking about two separate things.  He's referring to

16  what Mr. Lancaster talked about.  I think she's talking

17  about something completely different.

18              MR. BERKLEY:  I was going to ask more

19  questions to clarify that.

20              THE COURT:  Well, you need to clarify it,

21  because I'm not clear myself either.  So clear it up or

22  move on.

23              MR. BERKLEY:  Yes, sir.

24  BY MR. BERKLEY:

25  Q.    Is the Guard Easy Rate shared by insurance agents?

1   A.    It's our proprietor platform that our contracted

2   agents utilize to submit business to Guard and also

3   manage their book of business with Guard.

4   Q.    Is this Guard platform, was that utilized by

5   Mr. Lancaster in December of 2019?

6   A.    Yes.

7   Q.    So when Mr. Lancaster refers to a rater system,

8   he's talking about the Guard Easy Rate.

9        Is that the same thing?

10            MR. WALTHART:  Objection, Your Honor --

11            THE WITNESS:  I don't know.

12            MR. BERKLEY:  I'll move on then.

13            THE COURT:  Well, she can't know what he

14   was testifying to, so...

15            MR. BERKLEY:  Thank you.

16   BY MR. BERKLEY:

17   Q.    But Mr. Lancaster was AmGuard's agent in December

18   of 2019?

19   A.    Yes.

20   Q.    And he was the agent until August of 2020, correct?

21   A.    I'm not certain of when the relationship ended,

22   but...

23   Q.    It was some time after the fire.

24   A.    Yes.

25   Q.    Some months after the fire.

1   A.    Again, I'm not 100 percent certain when.

2   Q.    Are you familiar with what happened with the Joys'

3   home on May 5th, 2020?

4   A.    Yes.

5   Q.    When was it your understanding it was a total loss?

6   A.    When?

7   Q.    Yes.

8   A.    When the investigation occurred.

9   Q.    When was that?

10  A.    Not 100 percent certain.  Probably in May, I

11  believe.

12  Q.    May of 2020?

13  A.    May of 2020.

14  Q.    Yes.

15        So AmGuard knew in May of 2020 that the Joys' home

16  was completely destroyed.

17  A.    I would have to look at the report from the

18  investigation company.

19              MR. WALTHART:  Your Honor, we stipulated

20  to that.  We stipulated that --

21              THE COURT:  I believe that's right.

22  That's a stipulation.

23              MR. BERKLEY:  Okay.

24  BY MR. BERKLEY:

25  Q.    Now AmGuard denied the Joys' claim, correct?

UNREDACTED TRANSCRIPT

1    A.    Yes.

2    Q.    Let me show you something.

3              (ATTORNEY/ATTORNEY CONFERENCE.)

4                   MR. WALTHART:  It's listed in the --

5                   MR. BERKLEY:  Your Honor, I think we have

6    a stipulation to have this admitted.

7                   THE COURT:  Let's let her look at it first

8    and see if she can identify it.

9                   Now, Mr. Berkley, ask her if she

10   recognizes the document.

11   BY MR. BERKLEY:

12   Q.    Do you recognize this document, ma'am?

13   A.    Yes.

14                  THE COURT:  All right.  Do you want to

15   move it in admission?

16                  MR. BERKLEY:  Yes, move and admitted into

17   evidence.

18                  THE COURT:  Any objection?

19                  MR. WALTHART:  No, Your Honor.

20                  MR. CHANGAS:  No.

21                  THE COURT:  Without objection, be marked

22   and admitted.

23                  THE CLERK:  Marked as exhibit No. 13.

24                  (Exhibit No. 13 was marked.)

25                  THE COURT:  What is that, Mr. Berkley?

UNREDACTED TRANSCRIPT

1          MR. BERKLEY:  It is the February 2021

2  interrogatory responses of AmGuard.

3          THE COURT:  All right.  Go ahead.

4  BY MR. BERKLEY:

5  Q.   I'm going to just highlight a portion.  I'm going

6  to read it for you.  Make sure I read it correctly.

7       It says, please state the basis for defendant

8  AmGuard refusal to pay the fire loss benefits in

9  structure, contents and additional living expenses to

10  plaintiff on this policy number IVH --

11          THE COURT REPORTER:  Wait.  Wait.  I can't

12  hear you.

13          THE COURT:  Have you got your mic on?

14          MR. BERKLEY:  Yes, sir.

15          THE COURT:  Okay.  Is it not on?  You're

16  going to have to move it up.  Move it up on your tie or

17  your lapel.  You're not coming through very clear.  Try

18  begin.

19  BY MR. BERKLEY:

20  Q.   Interrogatory No. 4.

21       Please state the basis --

22          THE COURT:  Hold on.  It's not on.  Go

23  ahead, Mr. Berkley.

24  BY MR. BERKLEY:

25  Q.   Please state the basis --

UNREDACTED TRANSCRIPT

1              MR. BERKLEY:  Is that better, Your Honor?

2              THE COURT:  That's better.

3    BY MR. BERKLEY:

4    Q.    Please state the basis for defendant AmGuard's

5    refusal to pay the fire loss benefits for the structure,

6    contents and additional living expense provided to the

7    plaintiffs under policy number IVH0038445 --

8              THE COURT:  Slow down.  Remember, this

9    lady is taking down everything we're saying.  It's hard

10   enough under normal circumstances, so just take your

11   time.

12             MR. BERKLEY:  Yes, sir.

13   BY MR. BERKLEY:

14   Q.    And regarding the fire May 5, 2020 referenced in

15   the complaint.

16        AmGuard has determined that Anthony Lancaster

17   Agency, Anthony Lancaster, made an error on the

18   eApplication that his staff filled in on line indicating

19   that there were protective devices, i.e. sprinklers

20   inside the home.

21        Did I read that portion, that answer correctly?

22   A.    Yes, you read it correctly.

23             MR. WALTHART:  Your Honor, ask for the

24   rule of completeness and --

25             THE COURT:  I'll let you do that on

1    cross-examination.  Go ahead.

2    BY MR. BERKLEY:

3    Q.    So AmGaurd is saying that this is Anthony

4    Lancaster's mistake.  Is that what that response is

5    saying?

6    A.    That was subsequent --

7                   MR. WALTHART:  Objection, Your Honor.

8                   THE COURT:  Hold on.

9                   MR. WALTHART:  I think he just read the

10   response.

11                  THE COURT:  The response speaks for

12   itself.  That's for the jury to decide what that means.

13                  Ask your next question.

14                  MR. BERKLEY:  Thank you, Your Honor.

15   BY MR. BERKLEY:

16   Q.    So basically to sum up your testimony, AmGuard was

17   on actual notice in May of 2020 that the plaintiffs

18   didn't have a home.

19         Is that a fair statement?

20                  MR. WALTHART:  Objection.  Stipulated

21   that, Your Honor.

22                  MR. BERKLEY:  All right.

23                  MR. WALTHART:  It's irrelevant.

24                  MR. BERKLEY:  Then I'll move to the next

25   question.

1   BY MR. BERKLEY:

2   Q.   Same statement with actual notice that the

3   plaintiffs didn't have any clothes or food.

4        Is that a fair statement?

5   A.   I'm not 100 percent certain of what was in the

6   claim file at the time because I'm not a claims adjustor,

7   but I would assume that.

8                THE COURT:  Let me interrupt for a second.

9   Ma'am, what was your role in this -- what did you have to

10  do in this situation?  What role did you play?

11               THE WITNESS:  My role within the company

12  is to oversee our underwriting operations.  So I work

13  closely with agents and the business that they submit and

14  underwriting that business.

15               And as for the protective safeguards on

16  the policy and the processes and the -- I can speak to

17  the policy conditions associated with the protective

18  safeguards on the policy.

19               THE COURT:  Did you have any specific

20  involvement with this claim or this matter?

21               THE WITNESS:  With the claim, no.

22               THE COURT:  But overall, you supervise --

23               THE WITNESS:  Overall I oversee our

24  underwriting department.

25               THE COURT:  Okay.  All right.  Go ahead.

UNREDACTED TRANSCRIPT

1  I just want to be sure I was clear on what role you

2  played.

3                    MR. WALTHART:  Your Honor, if I could,

4  just since you were asking, I want to make sure that her

5  answers if fully given to you so you didn't think we're

6  holding anything back.

7                    She also was involved in -- when the

8  amendments were made to the policy, some of those, she

9  was directly involved with that.  So if you want to ask

10  her about that, I encourage you to do so.

11                    THE COURT:  Is that correct?

12                    THE WITNESS:  Yes.

13                    THE COURT:  All right.  Go ahead.

14                    MR. BERKLEY:  I'm just going over the

15  testimony to see if we need anything else at this point,

16  Your Honor.

17                    THE COURT:  Okay.

18                    MR. BERKLEY:  Court's indulgence.

19                    THE COURT:  Okay.  You can turn it off in

20  your pocket if you need to, Mr. Berkley.

21                    MR. BERKLEY:  Yes, sir.  I think I'll

22  tender, Your Honor.

23                    THE COURT:  All right.  Mr. Walthart.

24                    CROSS-EXAMINATION

25  BY MR. WALTHART:

1   Q.    Can you hear me?

2         Ms. Aigeldinger, I'm going to show you what's been

3   marked as Exhibit 5.

4         Do you recognize that document?

5   A.    Yes.

6   Q.    In fact, it looks like you electronically signed

7   that.

8   A.    Yes, I've certified this policy.

9   Q.    What does it mean to certificate a policy?

10  A.    Just means that I reviewed it in it's entirety and

11  it's a true, complete copy of the actual policy.

12  Q.    So this contains every document of the policy

13  that's at issue in this lawsuit, correct?

14  A.    Yes, the full declarations and every subsequent

15  endorsement.

16  Q.    Do you recognize this page?

17  A.    Yes.

18  Q.    What is this?

19  A.    This is the protective safeguard endorsement.

20  Q.    And with this protective safeguard endorsement, was

21  this in effect on the date of the fire in May of 2020?

22  A.    Yes.

23  Q.    Okay.  Was this required, was this protective

24  device required for the policy to be effective?

25  A.    For this policy, yes.

1   Q.    Is this the declaration page that was in effect on

2   the date of the fire?

3   A.    Yes.

4                    THE COURT:  You have to answer out loud.

5                    THE WITNESS:  Yes.

6   BY MR. WALTHART:

7   Q.    Do you recognize this page?

8   A.    Yes.

9   Q.    What is this page?

10  A.    This is an explanation of the protective devices

11  endorsement.

12  Q.    And does the protective devices endorsement pertain

13  to the sprinkler, the sprinklers that are listed in the

14  declaration page?

15  A.    Yes.

16  Q.    Does this, in essence -- jury has already heard

17  this.

18        But does this, in essence, state that for the

19  policy to be effective a sprinkler is required in the

20  home?

21  A.    Yes.

22  Q.    Do you recognize this document?

23  A.    Yes.

24  Q.    What is this?

25  A.    This is the first page of the declarations of the

1    policy.

2    Q.    When you look in the upper right hand corner of the

3    document it says, amended declarations.  Correct?

4    A.    Yes.

5    Q.    Does that mean that it was changed?

6    A.    Yes, this -- from -- this was an endorsement, yes.

7    Q.    Do you know if -- and explain to the jury what an

8    endorsement is.

9    A.    An endorsement is a change to the original policy.

10   Q.    Okay.  Do you know when this endorsement or

11   amendment was made to this policy?

12   A.    Can I see the second page?

13   Q.    Sure.

14   A.    The next.  Just looking for the schedule.  One

15   more.

16   Q.    Okay.

17   A.    Keep going.

18   Q.    Pardon me?

19   A.    The next page.

20         So this endorsement removed the protective

21   devices.

22   Q.    Okay.  It removed the requirement of sprinklers for

23   the policy to be effective.  Correct?

24   A.    Yes.

25   Q.    Okay.  And when was this document created in

1   relation to the fire loss on May 2020?

2   A.    It was created -- I believe it was created on May

3   13th.

4   Q.    Okay.  So it was after the fire loss, correct?

5   A.    Yes.

6   Q.    So this document that removed the sprinkler

7   requirement in the policy was not in existence prior to

8   the fire.

9         Is that correct?

10  A.    It was not.

11  Q.    Do you know the circumstances surrounding how this

12  document came to be created?

13  A.    Yes.

14  Q.    Tell the jury.

15  A.    On May 13th, Mr. Lancaster contacted our company

16  and spoke with someone in our customer services

17  department and had them backdate this endorsement to the

18  policy and section after the fire occurred.

19  Q.    Okay.  Now did this -- was this document -- did

20  this document ever become effective -- excuse me.

21        Did this endorsement removing the sprinklers ever

22  become effective?

23  A.    No, it was reversed.

24  Q.    Okay.  And was this document ever sent to the

25  insureds?

1  A.   No.

2  Q.   Was this document -- and I'm talking about in

3  context of this litigation, of course, where we handed

4  over all of our documents -- I'm talking about was this

5  document ever sent to the insureds prior to the lawsuit?

6  A.   No.

7  Q.   Okay.  Was this document ever sent to Mr. Lancaster

8  prior to the lawsuit?

9  A.   No.

10 Q.   Do you recognize this?

11      And just for reference I'll draw your attention to

12 the top right of the page.

13      It says, amended declarations.  Do you see that?

14 A.   Yes, sir.

15 Q.   Okay.  Do you know when this document was created

16 in relation to the previous document?  Let me ask you a

17 better question.

18      Do you know when this document was created in

19 relation to AmGuard creating the document removing the

20 sprinklers as a requirement?

21 A.   Yes, it was within hours.

22 Q.   Okay.  On the same day?

23 A.   On the same day, yes.

24 Q.   And why?  Just generally, why was it changed?  Or

25 why was that amendment created?

1  A.    It was created to back out the previous

2  endorsement.

3  Q.    The previous endorsement.  And which previous

4  endorsement are you referring to?

5  A.    The endorsement to remove the protective safeguard.

6  Q.    Here's another page.  Do you see that?

7  A.    Yes.

8  Q.    And again, we see that the sprinklers are again

9  required under the policy.

10        Would you agree with that?

11  A.    Yes.

12  Q.    Okay.  When was this created?

13  A.    It's the same, it's part of that same endorsement.

14  Q.    On the same day that --

15  A.    On the same dame.

16  Q.    -- AmGuard realized that it shouldn't send out the

17  previous endorsement, but put the sprinklers back in

18  effect --

19  A.    Correct, yep.

20  Q.    Again, on the policy do you recognize this?

21  A.    Yes.

22  Q.    And tell the jury what that is generally.

23  A.    This is an explanation of the protective safeguard

24  endorsement and the conditions in which it's applicable

25  to the policy.

1   Q.    Now let's talk about the policy.

2         Here AmGuard denied this claim for fire loss,

3   correct?

4   A.    Yes.

5   Q.    Okay.  Now what if, say, plaintiffs' home was

6   damaged in a hailstorm.

7         Would AmGuard have denied that claim?

8   A.    It depends on the circumstances and an

9   investigation would occur.

10  Q.    Okay.  But is there any -- is it covered under the

11  policy, that type of damage?

12  A.    Yes.

13  Q.    Is a sprinkler required to cover the house for a

14  hailstorm?

15  A.    No.

16  Q.    Okay.  And what about if like a car hit the house

17  and damaged it, would this policy cover that?

18  A.    Not unless there was a fire.

19  Q.    If the car hit it?

20  A.    If the car hit it and it resulted in a fire, it --

21  there still would not be coverage if there was a

22  sprinkler system.

23  Q.    What if there was just structural damage?

24  A.    If there was just structural damage, yes.

25  Q.    Okay.

1    A.     Property damage, yes.

2    Q.     What if there is a wind storm and that damaged the

3    home, would there be --

4    A.     Yes.

5    Q.     -- coverage under this policy?

6    A.     Yes.

7    Q.     So this policy was in effect for several types of

8    loss, just not fire because there weren't sprinklers?

9    A.     Yes.

10   Q.     Do you remember plaintiffs' counsel showing you

11   interrogatory responses and asking you why the claim was

12   denied?

13   A.     Yes.

14   Q.     Okay.  Let me show you what's been marked Exhibit

15   7.

16          Do you recognize this document?

17   A.     Yes.

18   Q.     Is it a business record of AmGuard?

19   A.     Yes.

20   Q.     Is it the type of business record that's kept in

21   the usual course of business?

22   A.     Yes.

23   Q.     Was this document sent to the plaintiffs?

24   A.     Yes.

25   Q.     What was the purpose of this document?

UNREDACTED TRANSCRIPT

1          If you need time to review it, please let me know.

2    I'll be happy to show you.

3    A.    I believe the purpose of this is in response to the

4    claim.

5    Q.    Okay.  What did it do in relation to the claim as

6    far as AmGuard is concerned?

7    A.    It disclaimed coverage and provided the explanation

8    why.

9    Q.    Okay.  To the best of your knowledge, does this

10   document contain all the reasons why the claim was

11   denied?

12   A.    Yes.

13   Q.    When was that sent to the plaintiffs?

14   A.    May 13th, 2020.

15   Q.    So 8 days after the fire?

16   A.    Yes.

17   Q.    Take a moment to review that, Ms. Aigeldinger.

18          I think I have the second most difficult name in

19   the room.

20   A.    Okay.

21   Q.    Would you agree that this first paragraph, this

22   gives a reason for disclaiming coverage, because there

23   was a misrepresentation in the application process

24   generally?

25   A.    Yes.

1    Q.    Okay.  Let me read it for you and for the jury.

2    I'll start here.

3          Our investigation after the firearm revealed that

4    there did not exist any automatic sprinklers —

5                    THE COURT:  Slow down, Mr. Walthart.

6    BY MR. WALTHART:

7    Q.    I'll start at the top.

8          We were provided with information prior to issuing

9    the policy on December 18th, 2019, that the property was

10   equipped with automatic sprinklers in all areas of the

11   insured premises except the attic, bathroom, closet and

12   attached structure area.

13         Our investigation after the firearm loss revealed

14   that there did not exist any automatic sprinklers in the

15   insured premises.  The named insured confirmed during the

16   investigation that there were no automatic sprinklers or

17   fire suppression devices installed in the insured

18   premises.

19         We do not provide coverage to an insured if there

20   was a misrepresentation of any material fact or

21   circumstance, and/or false statements made relating to

22   the insurance in the application process.

23         The information provided that there were automatic

24   sprinklers present in the insured premises was a material

25   misrepresentation of fact and/or false statement that

1   increased risk of loss to AmGuard.

2       We fully disclaim coverage for the fire loss due

3   to this material misrepresentation of fact and/or false

4   statement made in your application for the policy.

5       Did I read that correctly, ma'am?

6   A.    Yes.

7   Q.    To the best of your knowledge, it that AmGuard's

8   position?

9   A.    Yes.

10  Q.    Now this paragraph talks about receiving

11  information about automatic sprinklers in the application

12  process.  Correct?

13  A.    Yes.

14  Q.    Do you know what information was received from the

15  insured regarding automatic sprinklers?

16  A.    Yes.

17  Q.    What?

18  A.    From the insured directly we received a signed copy

19  of the proposal.

20  Q.    I'm showing you what's been marked as Exhibit 10.

21       Is that what you just referred to?

22  A.    Yes.

23  Q.    Okay.  And that is created on the proprietary

24  software of AmGuard.  Correct?

25  A.    Yes.

1   Q.    Okay.  And you would agree that this document

2   cannot be created without creating a full and complete

3   proposal of insurance.  Correct?

4   A.    Correct.

5   Q.    Okay.  So by viewing this we know that a full and

6   complete proposal of insurance was created.  Correct?

7   A.    Yes.

8   Q.    And there is a fax number on the left hand side, do

9   you see that, or a fax confirmation?

10  A.    Yes.

11  Q.    Do you know where this document was faxed to?

12  A.    I believe it was faxed to Guard from Anthony

13  Lancaster.

14  Q.    On what date?

15  A.    December 17th, 2019.

16  Q.    Just to be fair, you don't know the person that

17  faxed it, you're referring to the agency, correct?

18  A.    Correct.

19  Q.    The agency is the one that faxed it?

20  A.    Correct.

21  Q.    Now towards the bottom of this paragraph that I

22  just read into evidence it says, the information provided

23  that there were automatic sprinklers present in the

24  insured premises was a material misrepresentation of fact

25  and/or a false statement that increased the risk of loss

1    to AmGuard.

2         Do you see that?

3    A.    Yes.

4    Q.    What was the representations that increased the

5    risk of loss to AmGuard?

6    A.    They represented that they had sprinklers.

7    Q.    How did that increase the risk of loss to AmGuard?

8    A.    In the event of a fire there were no sprinklers.

9    Q.    Is a fire more or less likely with sprinklers?

10   A.    Less likely.

11   Q.    Now the second paragraph here, it states that the

12   policy declarations state that the named insured must

13   maintain sprinklers in all areas of the insured premises

14   except the attic, bathroom, closet and attached

15   structures as a condition of this insurance.

16        A policy endorsement also states that it is a

17   condition of coverage under Section 1, property

18   coverages, that the named insured must maintain all

19   protective devices in working order.

20        Protective devices refers to the devices listed on

21   the declaration page.

22        In this instance a noted above, sprinklers are a

23   protective device listed on the declarations page.  The

24   policy endorsement states that if the protective devices

25   listed in the declarations include an automatic sprinkler

30

1    system, we will not pay for loss or damage caused by or

2    resulting from fire prior to the fire -- excuse me, if

3    prior to the fire you failed to comply with any condition

4    set forth in the Paragraph A definitions of this

5    endorsement.

6         We fully disclaim coverage for the loss due to the

7    absence of sprinklers, which were a condition of this

8    insurance and a condition of coverage under the policy.

9         Do you see that?

10   A.    Yes, sir.

11   Q.    Were you aware of any other reason that AmGuard

12   disclaimed this claim?

13   A.    No.

14             MR. WALTHART:  Give me just a moment, Your

15   Honor.

16             THE COURT:  Okay.

17             MR. WALTHART:  I have one more quick line

18   of questioning.

19   BY MR. WALTHART:

20   Q.    I'm showing you what's been marked Exhibit 4.

21        Do you recognize that document?

22   A.    Yes.

23   Q.    What is this document?

24   A.    This is a Word document that was created internally

25   for internal processes.

1    Q.    Okay.  Now does this document -- is this sent to

2    AmGuard's insureds?

3    A.    No.

4    Q.    Is this document sent to AmGuard's agents?

5    A.    No.

6    Q.    Okay.  Why not?

7    A.    It's an internal, it's just an internal process.

8    Q.    Does AmGuard do anything to inform its insureds or

9    potential insureds about the substance of this policy?

10   A.    No.

11   Q.    Does AmGuard do anything to its agents to inform

12   them about the substance of its policy?

13   A.    No.  It has no bearing on the conditions of the

14   policy at all.

15   Q.    Okay.  Just one more thing to show you,

16   Ms. Aigeldinger.  Let me see here.

17         Do you recognize this document?

18   A.    Yes.

19   Q.    What is that document?

20   A.    This is a supplement to the first set of

21   interrogatories.

22   Q.    Okay.

23               MR. WALTHART:  I'd like to move that into

24   evidence, Your Honor.

25               THE COURT:  Any objection?

1          MR. BERKLEY:  No objection, Your Honor.

2          MR. CHANGAS:  No objection.

3          THE COURT:  Without objection, be marked

4   and admitted as next exhibit.

5          THE CLERK:  Marked as Exhibit No. 14.

6          (Exhibit No. 14 was marked.)

7          MR. WALTHART:  Thank you, sir.

8   BY MR. WALTHART:

9   Q.    You saw the previous interrogatories that

10  plaintiffs' counsel presented to you, correct?

11  A.    Yes.

12  Q.    Did you have any part in creating those?

13  A.    No.

14  Q.    Did you have any part in creating what's been

15  marked as Exhibit 14?

16  A.    Yes.

17  Q.    Okay.  Ask you, on the third to last page, is that

18  your signature, ma'am?

19  A.    Yes, it is.

20  Q.    Okay.  Did you realize you were signing this

21  document as testimony essentially under oath?

22  A.    Yes.

23  Q.    Interrogatory No. 4 states, please state the basis

24  for defendant AmGuard's refusal to pay the fire loss

25  benefits for the structure, contents, and additional

1   living expenses provided to plaintiffs under the policy,

2   the number for which I won't read.  But it's regarding

3   the May 5, 2020, fire referenced in the complaint.

4          Is this your answer, ma'am, underneath?  And we

5   can look at it.

6   A.    Yes.

7   Q.    Okay.  And this was meant to be a supplement to

8   those other interrogatories?

9   A.    Yes.

10  Q.    Okay.  Here it states that AmGuard provided this

11  information to plaintiffs in the May 13, 2020, letter

12  that we just looked at.  Correct?

13  A.    Yes.

14  Q.    It says, however, to summarize -- and take a minute

15  to read that.

16         But would you agree that the reasons stated here

17  virtually mirror the May 13th letter declining coverage

18  to the plaintiffs?

19  A.    Yes.

20  Q.    Turn to the next page so you can see the full

21  answer, and for the jury.

22         That's AmGuard's answer, correct?

23  A.    Yes, it is.

24              MR. WALTHART:  I'll pass the witness.

25              THE COURT:  Mr. Changas.

1         CROSS-EXAMINATION

2            (ATTORNEY/ATTORNEY CONFERENCE.)

3    BY MR. CHANGAS:

4    Q.    Ms. Aigeldinger, my name is David Changas.   I

5    represent the agency.

6         Now you were asked about the endorsement change

7    that Mr. Lancaster suggested after the fire occurred.

8         Is that correct?

9    A.    Yes.

10   Q.    And had there been no fire, your company would have

11   changed, removed the endorsement and except the policy in

12   place without sprinklers.   Right?

13   A.    Say that again.

14   Q.    Had -- let's assume before -- there was no fire.

15   Had Mr. Lancaster called to have the endorsement changed

16   to no sprinklers, the policy would have remained in

17   effect without -- the endorsement would have been

18   changed.   Correct?

19   A.    Perspectively.

20   Q.    Going forward?

21   A.    Correct.

22   Q.    In other words, you didn't require people to have

23   these, the Joys to have sprinklers in their home to

24   insure them at all, did you?

25   A.    Under this particular policy with the endorsement,

35

1   it's a requirement.

2   Q.   Okay.  That's -- I understand what you're saying,

3   that this policy required the sprinklers.

4        In general, if "no" had been checked when this

5   application process was filled out, there wasn't a

6   company requirement you had to have fire sprinklers in

7   your home to get coverage through AmGuard.

8        Is that correct?

9             MR. WALTHART:  Objection, Your Honor.  I

10  don't think that's relevant.

11            THE COURT:  Overruled.

12  BY MR. CHANGAS:

13  Q.   You can answer the question.

14            MR. WALTHART:  You can answer.

15            THE WITNESS:  We would still issue the

16  policy.  It would be a different policy, a different

17  premium, different --

18  BY MR. CHANGAS:

19  Q.   Sure.  And the -- do you know what the premium

20  discount was here?

21  A.   Not off the top of my head.

22  Q.   Okay.  You didn't have any conversations with

23  Mr. Lancaster about this changing the policy, backdating

24  it, did you?

25  A.   Yes, I did.

1    Q.    When did you speak to him?

2    A.    I spoke with him personally on May 13th of 2020.

3    Q.    What was the nature of that conversation?

4    A.    I called to inform him that the endorsement would

5    be reversed.

6    Q.    Okay.  Meaning -- this was after -- reversed back

7    to the way it was?  Back to --

8    A.    The original.

9    Q.    Let's make sure we're clear, so we don't confuse

10   the jury here.

11         The policy had the sprinkler endorsement, right?

12   A.    Yes.

13   Q.    It was removed after he called and spoke with

14   someone else in the company, right?

15   A.    Yes.

16   Q.    And then it was put back in the policy after your

17   conversation with him?

18   A.    Right.

19   Q.    Okay.  So you weren't involved in the process of

20   removing it initially?

21   A.    No.

22   Q.    Okay.  You didn't handle the claim related to the

23   Joys' residence, did you?

24   A.    No.

25   Q.    All right.  You don't handle claims.  That's not

1    your job?

2    A.    No.

3    Q.    In other words, determining whether there is

4    coverage or whether there is going to be -- I guess

5    you -- I used the word deny coverage and you used the

6    word disclaim.

7          Is there a difference between those terms in your

8    mind?  Is that just industry lingo?

9    A.    I think it's just industry lingo, yes.

10   Q.    Okay.  So this claim that the Joys made for the May

11   5 fire was disclaimed.  Correct?

12   A.    Yes.

13   Q.    And you had nothing to do with making that

14   decision?

15   A.    No.  Strictly based on the policy language.

16   Q.    Did you have anything to do with the agency

17   agreement between AmGuard and Mr. Lancaster's agency, the

18   written contract?

19   A.    No.

20   Q.    Okay.  The policy application, are you familiar

21   with that at all?

22   A.    Yes.

23   Q.    It did contain the term automatic sprinklers,

24   correct?

25   A.    The policy application?

1    Q.    Yes.

2    A.    Yes.

3    Q.    And then the endorsement said sprinklers?  That was

4    the term that we saw earlier.

5          I can show it to you, if you need me to.

6    A.    Okay.

7    Q.    The policy itself said the word sprinklers in

8    the -- if I may...

9          Here we see the protective devices endorsement.

10   You would see the term "sprinkler" there.  Is that

11   correct?

12   A.    Yes.

13   Q.    All right.  The application itself used "automatic

14   sprinklers".  Correct?

15   A.    What was --

16   Q.    The proposal.  I'll be glad to show that to you as

17   well.  Exhibit -- I was just referring to the policy,

18   which is Exhibit 1.

19         In the proposal that we've seen here in this

20   trial -- I don't know if you were shown, so I apologize

21   if I put words in your mouth.

22         Section 5, the question is about automatic

23   sprinklers.  Correct?

24   A.    Yes.

25   Q.    All right.  You were asked about an internal

1    directive, I guess, Exhibit 4 to the proceedings a minute

2    ago.  I'll show this to you again.

3            Exhibit 4 deals with -- you said these were

4    basically internal guidelines that the company has?

5    A.    Just, yep, internal process.

6    Q.    Best practices for the company?

7    A.    Yes.

8    Q.    And no one -- the agency wouldn't have any reason

9    prior to this lawsuit to know about those, right?

10   A.    No.

11   Q.    And nor would the plaintiffs?

12   A.    No.

13   Q.    These are policies, or internal procedures that the

14   company sets forth itself.

15           Is that correct?

16   A.    It's a manual aspiration.

17   Q.    An aspirational process.

18           And let's go through this aspirational process on

19   the issue.

20           Automatic sprinkler certification photo.  I assume

21   cert means certification, right?

22   A.    Yes.

23   Q.    And in this case we had automatic sprinklers

24   selected on the policy application.

25           Is that right?

1    A.    Yes.

2    Q.    Okay.  And we see "required if".  So required.

3          You must do this, right?

4    A.    (No verbal response.)

5    Q.    On the home specifics tabs, automatic sprinklers

6    are listed as yes.  In this case they were listed as yes,

7    but with the qualifier of, in all areas except bathroom,

8    et cetera.  Right?

9    A.    Yes.

10   Q.    That would be a yes, correct?

11   A.    I would agree, yes.

12   Q.    It's not a no.

13         If it's a no, you don't have anything to check on.

14         Required by issuance -- after issuance, 30 days.

15   So the aspiration is within 30 days of this policy being

16   issued with this endorsement, you would, you would do

17   this within 30 days, right?

18   A.    Yes.

19   Q.    And this policy was issued on December 18th, 2019.

20   Correct?

21   A.    Yes.

22   Q.    So the procedure is outlined very clear, I would

23   submit, correct?

24         It says, issue the policy.  If the certification

25   photo, slash photo.  So you need one of those two things.

1   Right?

2   A.    (No verbal response.)

3   Q.    A certification of this fire system in the home,

4   correct?

5   A.    At the time we had the signed proposal.

6   Q.    Pardon?

7   A.    We had the insured's signed proposal.

8   Q.    Okay.  Well --

9   A.    Which we --

10  Q.    That's not my question, with all due respect.

11        This is your internal policy of your company,

12  correct?

13              MR. WALTHART:  Object to form.  That's not

14  what she testified to.

15              THE COURT:  Overruled.  Go ahead.

16  BY MR. CHANGAS:

17  Q.    If the certification photo is not already -- now

18  photo.  Would that mean you could have a photograph of

19  sprinklers?

20  A.    Yes.  It doesn't, it doesn't mean that -- it

21  doesn't have any bearing on the policy conditions.

22              THE COURT:  Ma'am, that wasn't the

23  question.  Answer his question, if you will, please.

24              THE WITNESS:  Okay.

25  BY MR. CHANGAS:

UNREDACTED TRANSCRIPT

1  Q.   The photo would be a photograph of the sprinklers

2  in the home, correct?

3  A.   Yes.

4  Q.   All right.  If is not already in the file, send a

5  conversation requesting the certification and photo.

6       Who would that be sent to, the agent or someone

7  else in the field?

8  A.   It would be sent to the agent.

9  Q.   Okay.  So the agent would be told.

10      And then set a diary for 15 days, meaning let's

11 follow up.  Set a calendar entry for 15 days from now and

12 we'll follow up on this.  Right?

13 A.   Yes.

14 Q.   All right.  After 15 days, if the certification

15 photo is still not in the file, we will send a follow-up

16 conversation and reset our diary for another 15 days.

17      So if you don't get it in that first days, you

18 kind of just bump it out, sort of back, a back deadline

19 so you're not just -- it's not a hard stop, right?

20      And then if you don't have it after the full 30

21 days, which in this case would be January 17th or so,

22 correct?  Would you agree with me, 30 days after the

23 18th?

24 A.   Yes.

25 Q.   Okay.  We will endorse the policy change to change

UNREDACTED TRANSCRIPT

1   the yes to a no.  Meaning, we'll take off the fire

2   sprinkler endorsement and we'll -- there will be no

3   discount for that.  Is that right?

4   A.    Yes.

5   Q.    Okay.  If the certification and photo is then

6   received after the policy was already endorsed to change

7   the answer to no, we will endorse the policy effective

8   the installation date on the certification/date the photo

9   was sent in, to change the answer back to yes.

10        So you would then -- if you got it after the 30

11  days, you could go back and change the endorsement back.

12  Right?

13  A.    Yes.

14  Q.    You testified that the endorsement was designed to

15  reduce -- sprinklers reduce the risk.  And the

16  endorsement is an indication that you have the

17  sprinklers, that the home has sprinklers.  Correct?

18  A.    Yes.

19  Q.    And that would reduce the cost of the premium,

20  correct, because your risk is lower, right?

21  A.    Yes.

22  Q.    Okay.  In this case, no one from AmGuard followed

23  this procedure, did they?

24  A.    No.

25  Q.    Okay.  No one checked to make sure there was a

1    sprinkler in this home, did they?

2    A.    No.

3    Q.    No one called the Joys to see, is there a sprinkler

4    in this home?

5    A.    We would not do that, no.

6    Q.    No one called the agency to see, to ask to follow

7    up on this.

8    A.    No.

9    Q.    Let's look at the next policy, the auto dec page.

10          This is another of the same type of procedures

11   that company has.

12          Is that right?

13   A.    Yes.

14   Q.    On the modifiers tab this is -- again, required it.

15          On the modifiers tab, the question, will the

16   insured have an in force personal auto policy --

17              THE COURT:  Mr. Changas, you slow down

18   too, please.

19              MR. CHANGAS:  I'm sorry.  I was going to

20   be the one who didn't do it, but apparently no.

21   BY MR. CHANGAS:

22   Q.    On the modifiers tab, the question, quote, will the

23   insured have an in force personal auto policy with the

24   same agency that is quoting, slash, submitting, slash,

25   issuing, this homeowner's policy, close quote, is

1    answered as yes.
2         Again, after 30 days you will have the same basic
3    procedure, right?
4    A.    Yes.
5    Q.    To verify that particular -- that they have -- you
6    would give a discount for multiple policies with the same
7    agency, right?
8    A.    Yes.
9    Q.    And do you understand that that was actually --
10   this procedure was followed in the Joys' case?
11   A.    Yes.
12   Q.    Okay.  Do you know if anyone from AmGuard ever went
13   to the Joys' home prior to the fire?
14   A.    No.
15   Q.    Would you agree with me that if the policy we just
16   looked at in Exhibit 4 had been followed, internal policy
17   had been followed, this endorsement would have been
18   changed to a no without the certification of the
19   sprinkler system in the home?
20                MR. WALTHART:  Objection, Your Honor,
21   relevance.
22                THE COURT:  Overruled.
23                THE WITNESS:  Could you repeat it?
24   BY MR. CHANGAS:
25   Q.    Do you agree with me that if this internal policy

1   had been followed by AmGuard, the endorsement -- either

2   you would have gotten a certification that there was --

3   or in this case you would have learned there wasn't a

4   sprinkler system in the home, and the endorsement would

5   be changed back to a no, there would be no fire sprinkler

6   endorsement, or no sprinkler endorsement on the policy as

7   of no later than mid January?

8   A.    Possibly.

9   Q.    What do you mean by possibly?

10  A.    It didn't happen, so.

11  Q.    But if you had -- that's what I'm asking.

12        If the company would have followed the policy --

13  A.    I don't know what the agency would have responded.

14              THE COURT:  Ma'am, listen to the question.

15  I think he's asking you a specific question.

16              Just reask it, Mr. Changas.  Ma'am, if you

17  will, just answer it best you can.

18  BY MR. CHANGAS:

19  Q.    If the policy had been followed by AmGuard, it's

20  own internal policy had been followed, it would have

21  either learned that -- obviously, in this case, would

22  have learned that there were no sprinklers in the home,

23  and it would have changed the endorsement on the

24  sprinklers from a yes to a no, and would have removed

25  that endorsement.

1          Would you agree with me?

2    A.    Yes.

3    Q.    Okay.

4              MR. CHANGAS:  That's all the questions I

5    have for now.  Thank you.

6              MR. WALTHART:  Your Honor, I'd like to

7    request a sidebar.

8              THE COURT:  Okay.  Come up.

9              (WHEREUPON, SIDEBAR WAS HELD OUTSIDE THE

10   HEARING OF THE JURY AND THE PROCEEDINGS CONTINUED AS

11   FOLLOWS.)

12             THE COURT:  Ladies and gentlemen, this

13   would probably be a good time to take our lunch break.

14   If you will, be back in the jury room at 1:30.

15             I didn't mention this yesterday, you

16   probably already know this by now, there is not a

17   cafeteria or anything like that in this building.  In

18   fact, we don't even have vending machines any longer, I

19   don't think, because of COVID.  But there are several

20   restaurants near by.

21             Again, you've probably already discovered

22   that.  But just go and enjoy your lunch and be back in

23   the jury room by 1:30, if you would.

24             Don't discuss the case or do any research

25   or investigation.

1                          (Jury Out.)

2                          (Recess Taken.)

3                          THE COURT:  Okay.  All right.  Anything

4     else before we bring in the jury?

5                          Have you got your next witness ready?

6                          MR. BERKLEY:  Well, I'm still on redirect,

7     Your Honor.

8                          THE COURT:  Okay.  That's right.

9                          Come up, Ms. Aigeldinger.  Am I saying

10    that correct?

11                         THE WITNESS:  Aigeldinger.

12                         THE COURT:  Aigeldinger, excuse me. Have a

13    seat.  I will remind you that you remain under oath.

14                         Okay, Tim.

15                         (Jury in.)

16                         THE COURT:  Be seated, please.  Welcome

17    back, ladies and gentlemen.  I believe we're ready to

18    proceed.

19                         Mr. Berkley, are you ready to do your

20    redirect?

21                         MR. BERKLEY:  Yes.  I'll be very brief in

22    this case.

23                         THE COURT:  Go ahead.

24                         FURTHER DIRECT EXAMINATION

25    BY MR. BERKLEY:

                          UNREDACTED TRANSCRIPT

1   Q.    Let me make sure I have got your name correct.

2   Aigeldinger?

3   A.    Aigeldinger.

4   Q.    Aigeldinger.  My bad.  Very good.

5         I'm going to be very brief in this.

6         I'm showing you a policy page here.

7         When does it say that was issued, on the face of

8   the policy?

9   A.    Could you repeat that?

10  Q.    Yes.  When does this document, this particular page

11  of the policy say this was issued?

12  A.    12/18/2019.

13  Q.    Right.  And that's the policy you certified,

14  according your earlier testimony.  Correct?

15  A.    Yes.

16  Q.    Okay.

17              MR. BERKLEY:  I think I'm done, Your

18  Honor.

19              MR. WALTHART:  Your Honor, could I have a

20  couple of questions?

21              THE COURT:  All right.  I'll allow it.

22              FURTHER CROSS-EXAMINATION

23              THE COURT:  Let's see, Mr. Berkley, have

24  you got one of our marked exhibits, or is that your copy?

25              MR. BERKLEY:  It's a marked exhibit, Your

1  Honor.

2                    THE COURT:  Do you want to return it to

3  the --

4                    MR. WALTHART:  You can leave that at the

5  podium.

6                    THE COURT:  -- so we don't misplace

7  exhibits.

8                    MR. BERKLEY:  Yes, sir.

9  BY MR. WALTHART:

10  Q.    Ms. Aigeldinger, explain to the jury why the date

11  is indicated as 12/18/2019.

12  A.    Because it was issued retroactively.

13  Q.    Okay.  And just so we can be absolutely clear,

14  explain to the jury what that means and why that decision

15  would have been made.

16  A.    (No verbal response.)

17  Q.    Retroactively.  What does retroactively mean?

18  A.    It means back to the beginning of the policy

19  period.

20  Q.    But was that document that opposing counsel just

21  showed you created on 12/18 --

22  A.    No.  No.

23  Q.    Is that document that counsel just showed you the

24  same document that was created as a result of

25  Mr. Lancaster's call after the fire?

1   A.    Yes.

2   Q.    Okay.  And was that the same document that on the

3   very same date that document was created it was changed

4   once AmGuard realized what was going on?

5   A.    Yes, sir.

6                    MR. WALTHART:  Thank you.

7                    THE COURT:  Mr. Changas, anything else

8   from you regarding this witness?

9                    MR. CHANGAS:  No, Your Honor, I do not

10  have anything.

11                   THE COURT:  Thank you, ma'am.  You can

12  step down.

13                   (WHEREUPON, TRIAL PROCEEDINGS WERE HELD

14  AND WERE NOT ORDERED.

15                   THE REQUESTED PROCEEDINGS CONTINUED AS

16  FOLLOWS.)

17

18

19

20

21

22

23

24

25

1          MR. WALTHART:  Your Honor, I will call

2    Dawn Aigeldinger.  I'll step outside and...

3          THE COURT:  All right.  All right.  You

4    can remove your mask once again if your don't mind, and

5    you remain under oath.

6          THE WITNESS:  Okay.

7          DIRECT EXAMINATION

8    BY MR. WALTHART:

9    Q.    Ms. Aigeldinger, couple of things.

10         We have heard some testimony today that the,

11   proposal of insurance, about the automatic sprinklers is

12   a default provision that says in all areas except attic,

13   bathroom and attached structures, et cetera.

14         Is that true?

15   A.    No.

16   Q.    Okay.  What -- is there a default provision?

17   A.    In our system?

18   Q.    Yes.

19   A.    It just says, please choose.  Then there is a drop

20   down box.  And the choices are yes, no, and in all areas

21   except attic, etc.

22   Q.    Okay.  There has also been some testimony today

23   that when an agent is filling out an application

24   information using AmGuard's platform, that that agent

25   receives some kind of notification that AmGuard is going

1   to follow up and investigate or give proof of the

2   protective devices.

3        Is that a thing with AmGuard?

4   A.   There is different messaging in there.  It could

5   say that we may.

6   Q.   Okay.  Does AmGuard every say that it will or

7   shall?

8   A.   No.

9   Q.   Mr. Lancaster testified that there was a message in

10  red that gave a time frame of a certain number of days

11  that AmGuard would follow up.

12       Is that the case?

13  A.   No.

14  Q.   Okay.  Have you looked into other applications for

15  insurance that Anthony Lancaster Insurance Agency has

16  written for homeowners under Guard?

17  A.   Yes, I looked at an in force policy report.

18  Q.   Explain to the jury what that is.

19  A.   It's just a report that shows me all of the in

20  force policies for a specific agency.

21  Q.   And for this specific agency -- is Mr. Lancaster's

22  agency?

23  A.   Yes, sir.

24  Q.   Okay.  How many in force policies does

25  Mr. Lancaster's agency have?

1  A.   Seven.

2  Q.   Okay.  Out of those seven, how many of those had a

3  sprinkler discount?

4  A.   Out of those seven --

5            THE COURT:  Hold on one second.

6            MR. CHANGAS:  Objection to relevance here.

7            MR. WALTHART:  I think it's very relevant.

8  They're saying this was a one-off, an interpretation,

9  mistake, and that everyone should know that there aren't

10 sprinklers in area.  So I think it's very important to

11 know how many other --

12           THE COURT:  Overruled.

13           MR. CHANGAS:  Can I say I don't recall

14 any -- this one-off.  I don't know what characterization

15 that is.

16           THE COURT:  Well, there is testimony this

17 was a default.  And that's been opened up pretty wide, so

18 I'm going to let her testify about the question.  Go

19 ahead.

20           THE WITNESS:  Out of the seven policies,

21 the agency indicated that four had sprinklers.

22 BY MR. WALTHART:

23 Q.   Were these residential homes?

24 A.   All residential, yes.

25 Q.   Okay.  Out of all of the policies that AmGuard has

UNREDACTED TRANSCRIPT

1    written through Mr. Lancaster's insurance agency, did it

2    go back on all seven -- all four of those policies, and

3    confirm the presence or absence of sprinklers?

4    A.    No.

5    Q.    Okay.  Thank you.

6                    THE COURT:  Mr. Changas.

7                    CROSS-EXAMINATION

8    BY MR. CHANGAS:

9    Q.    Ms. Aigeldinger, let me be clear.

10        The company didn't follow up on its internal

11   policy in any of the policies that were written through

12   the agency, Mr. Lancaster's Agency?

13   A.    There was one out of four.

14   Q.    One.  Okay. I may have misunderstood you.

15        This was the only one?

16   A.    No.  We followed up on one policy out of the four.

17   Q.    Okay.  So you did follow up on one of the policies

18   then?

19                    THE COURT:  Answer out loud.

20                    THE WITNESS:  Yes.

21   BY MR. CHANGAS:

22   Q.    Again, going back to just the issue of this

23   particular situation.

24        It wouldn't have been hard to verify the presence

25   of interior sprinklers in the Joys' home, would it?

1  A.    Well, depends on what you determine as

2  verification.

3  Q.    Well, if your determination is either certification

4  or photo, you could have called somebody and said we

5  need --

6  A.    Those are two examples of what could be constituted

7  as proof.  But as I testified before, there was already a

8  signed proposal in our file.

9  Q.    Then there seems it would be -- if all you need is

10  a signed proposal, then why does this internal policy

11  exist?

12  A.    It's just an aspirational process.  It doesn't

13  change the terms and conditions of the policy at all.

14  Q.    I'm not suggesting it does.  But it's your policy,

15  you admit it.  Right?

16  A.    It's an internal process.

17  Q.    For AmGuard Insurance Company.

18        And you would agree with me it wouldn't have taken

19  long to verify, right?

20  A.    It's a manual process that -- I mean, we have

21  240,000 in force policies.

22  Q.    Okay.  And you issue policies for each of those

23  individuals, right?

24  A.    Yes.

25  Q.    You had how many in Tennessee?

57

1   A.   I am not sure of the state breakdown on that.

2   Q.   How many homes in Tennessee have you insured that

3   have fire sprinklers?

4   A.   I do not know --

5   Q.   Would it be less than one?

6        Do you think you -- how many homes do you insure

7   company wide that have fire sprinklers, do you know?

8   A.   I do not know.

9   Q.   Would it be a very small amount?

10  A.   I can't even speculate.

11  Q.   Do you know anything about Grand Junction,

12  Tennessee, what it's like?

13  A.   No.  I'm from Pennsylvania.

14  Q.   Do you know anybody that you work with at AmGuard

15  that knows anything about Grand Junction, Tennessee?

16  A.   No.  I mean, that's why we rely on our agents.

17  Q.   The application that was utilized -- well, you rely

18  on agents, but you still have this internal policy,

19  right?

20  A.   Again, we rely on our agents.

21  Q.   Well, that's not my question.

22       You still have the policy no matter whether you

23  rely on your agents or not, right?

24  A.   We have many, many internal aspirational processes

25  in place.

1  Q.   AmGuard came up with a application language, right?

2  A.   AmGuard came up --

3  Q.   The automatic sprinkler language is AmGuard's

4  language, right?

5  A.   Not 100 percent sure, because it's an ISO based

6  policy.

7            MR. CHANGAS:  We had a stipulation

8  actually on this point, Your Honor.

9            MR. WALTHART:  We agree, Your Honor.  It's

10 using AmGuard's, that's been --

11            THE COURT:  Well, she may not be familiar

12 with the stipulation.

13            MR. WALTHART:  We will stipulate --

14 BY MR. CHANGAS:

15 Q.   Well, I will submit to you that AmGuard submits

16 that it created the term "automatic sprinklers".  Right?

17      There would be other terms you could utilize, like

18 fire sprinkler, fire suppression, fire supression

19 sprinklers, that might be a little clearer than just the

20 term automatic sprinklers.

21      Would you agree?

22 A.   I'm not sure why it's not clear.

23 Q.   You're saying that the term fire, something that

24 might refer to fire sprinklers wouldn't be clearer than

25 automatic sprinklers?

1  A.    Well, it's under protective devices.

2  Q.    That's not my question.

3        Do you agree that it would be clearer if it said

4  something to the effect of fire sprinklers or fire

5  suppression?

6  A.    Clearer than what?

7  Q.    Automatic sprinklers.

8  A.    I guess I don't understand what the confusion is.

9  Q.    Okay.  You don't understand -- just -- I'm not

10 trying to badger you here.

11       But you don't understand that -- whether it would

12 be clearer to someone interpreting that term to say fire

13 sprinklers than it would be to say automatic sprinklers?

14 A.    As opposed to what other kind of sprinkler?

15                MR. WALTHART:  Asked and answered.

16                MR. CHANGAS:  She hasn't answered.

17                THE COURT:  I was going to say, I'm not

18 sure that -- ma'am, you're the witness testifying.

19 You're under oath.  You understand.

20                His question is, in your estimation, based

21 upon your work in the industry, would the term fire

22 suppression sprinklers be clearer than automatic

23 sprinklers?  That's the question.

24                If you don't have an answer to that, you

25 can say I don't know.  You can say --

1          THE WITNESS:  I mean, I don't understand

2    what other kind of sprinkler it would be.

3    BY MR. CHANGAS:

4    Q.    I'll just move on.  I think we...

5          AmGuard's relationship with the agency was

6    relatively new.  Right?

7    A.    I'm not certain of when --

8    Q.    Do you know whether the agency provided any

9    training to anybody for its product?

10   A.    Did Guard provide the agency with training?

11   Q.    Sorry.  Yes.  Did Guard?  Correct.

12   A.    Yes, I believe --

13   Q.    What type of training would it have provided?

14   A.    Our sales department provides training when they're

15   on-boarding a new agent.

16   Q.    Okay.  Do you know if that all was done here with

17   Mr. Lancaster's agency?

18   A.    I'm not 100 percent certain.

19   Q.    Do you know if it was done, whether there was

20   training on this application process, or anything of that

21   nature?

22   A.    It's standard procedure --

23   Q.    Okay.

24   A.    -- to do so.

25   Q.    But you're not sure what was done here.  Right?

1   A.    I'm not part of that, no.

2   Q.    You're not clear on how many homeowner's policies

3   in 2019 that AmGuard sold in the state of Tennessee?

4   A.    I do not know that off the top of my head, no.

5   Q.    Are you aware of the amount of discount that the

6   Joys were receiving for the policy for the presence of

7   sprinklers?

8   A.    I'm not 100 percent certain what it would be,

9   because it varies by policy.  I think it might be a

10  percentage.

11  Q.    If it's been indicated that it was in the $200 per

12  premium year range, would that sound about right on a

13  home that's --

14  A.    Yeah.

15  Q.    Okay.  For this home, it wouldn't sound out of

16  whack?

17  A.    No.

18  Q.    The premium being about $2,400, they would get a

19  $200 discount?

20  A.    That sounds about right, probably, yeah.

21  Q.    So there is -- you testified earlier that the lack

22  of sprinklers increases your risk of loss.  And had there

23  not been sprinklers, we're talking about a couple of

24  hundred dollars a year more in premium payments AmGuard

25  would have, would have required for this policy.

UNREDACTED TRANSCRIPT

1  Correct?

2  A.    If that's what the discount was.

3  Q.    Okay.  Do you know whether -- strike that.

4        Did you have anything to do with an indemnity

5  demand being made to Mr.Lancaster's agency?

6  A.    No.

7  Q.    You didn't direct -- well, I'm no going to ask that

8  question.

9              MR. CHANGAS:  One moment, Your Honor.  I

10 may be through.

11             (ATTORNEY/ATTORNEY CONFERENCE.)

12 BY MR. CHANGAS:

13 Q.    Just a few more, Ms. Aigeldinger.

14       Has AmGuard changed any of its aspirational

15 policies, internal policies since this incident?

16             MR. WALTHART:  Your Honor, I object to

17 post remedial measures.

18             MR. CHANGAS:  That's not a post remedial

19 measure, that's -- that doesn't -- it's not going to --

20 it's not --

21             THE COURT:  I'll allow you to ask as it

22 relates to this one particular policy, but not system

23 wide.

24             THE WITNESS:  It's possible.  But those

25 internal processes are outside of my unit.

UNREDACTED TRANSCRIPT

1    BY MR. CHANGAS:

2    Q.    Okay.  You're not even the one who sets those

3    policies?

4    A.    No.

5    Q.    Okay.  But you are aware of the policies?

6    A.    Yes.

7    Q.    Okay.  Has AmGuard changed any other internal

8    policies related to this type of coverage since this

9    fire?

10   A.    Possibly.

11   Q.    Same answer?

12   A.    Uh-huh (affirmative response).

13   Q.    Is that a yes?  Just for the record.

14   A.    Yes.

15   Q.    Okay.

16   A.    Yes.  Sorry.

17   Q.    Not picking, I promise.

18        Do you know if the term automatic sprinklers is

19   still what's used in that application?

20   A.    Yes.

21   Q.    It is?

22   A.    Yes.

23   Q.    Has the application changed at all at this point?

24   A.    Possibly.

25   Q.    Okay.  So you're saying, yes, they still use the

1    term automatic sprinklers.  But you don't know if the

2    application is the same.

3           This is -- we're talking -- this happened two and

4    a half years ago.

5           Do you know whether that particular application

6    has changed at all?

7    A.    It is possible that it has changed.  There has been

8    lots of changes.

9    Q.    Is it also possible that the term automatic

10   sprinklers is not what is used at this point?

11   A.    We still use the term.  We still use the term.

12   Q.    Okay.  Are you aware of any other disclaimed events

13   similar to the one that --

14                MR. WALTHART:  Objection, Your Honor.

15   It's outside scope of this case.  It's irrelevant.

16                THE COURT:  Sustained.

17   BY MR. CHANGAS:

18   Q.    Did you have -- are you aware of the -- well, I'm

19   not going to -- strike that.

20                MR. CHANGAS:  That's all I've got.  Thank

21   you.

22                THE COURT:  Mr. Berkley, any questions?

23                MR. BERKLEY:  Briefly, Your Honor.

24                CROSS-EXAMINATION

25   BY MR. BERKLEY:

UNREDACTED TRANSCRIPT

1    Q.    Ms. Aigeldinger, are you aware of any -- are you

2    aware of any -- you said there were 240,000 policies in

3    enforce, I think you testified to.

4        Do all of those use the term generically sprinkler

5    in them?  Strike that question.  You look confused.

6        Can the term automatic sprinkler mean more than

7    one thing, more than one type of sprinkler, I guess is

8    the question?

9    A.    As it relates to, in all areas except the bathroom,

10   the attic and attached structures?

11   Q.    Just the term automatic sprinklers, yes.

12   A.    As a protective device for a dwelling?

13   Q.    The term, automatic sprinkler.

14   A.    Possibly.

15   Q.    Okay.  Could it include -- strike that question.

16            MR. BERKLEY:  Your Honor, I'm going to sit

17   down.

18            THE COURT:  Any redirect?

19            MR. WALTHART:  No, Your Honor.

20            THE COURT:  All right.  Thank you.  You

21   can --

22            MR. WALTHART:  I was going to ask, if

23   everyone is done, I'd like to ask Ms. Aigeldinger to be

24   excused.

25            THE COURT:  Okay.

UNREDACTED TRANSCRIPT

1          MR. CHANGAS:  I think that's fine.

2          MR. WALTHART:  Okay.  You can step down.

3          (End of Requested Material.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

UNREDACTED TRANSCRIPT

1          I, Kristi Heasley, do hereby certify that the

2   foregoing 66 pages are, to the best of my knowledge,

3   skill and ability, a true and accurate unredacted

4   transcript from my stenotype notes in the matter of:

5   IVA JOY and WILLIAM JOY

6                                          )
    VS                                     )NO.1:20-CV-01132
7                                          )JACKSON, TENNESSEE
    AMGUARD INSURANCE COMPANY              )
8

9   VS

10  ANTHONY LANCASTER INSURANCE
    AGENCY, INC., and ANTHONY
11  LANCASTER,

12

13         Dated this 4th day of July, 2022.

14

15

16  /s/  Kristi Heasley

17  ----------------------------------
    Kristi Heasley, RPR
18  Official Court Reporter
    United States District Court
19  Western District of Tennessee
    Eastern Division
20

21

22

23

24

25

                    UNREDACTED TRANSCRIPT